UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MABEL DOUGLAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 07 C 4582 |
| | ) |
| MICHAEL J. ASTRUE, | ) Judge Nan R. Nolan |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mabel Douglas claims that she is disabled due to depression, diabetes, obesity, arthritis and incontinence. She filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment. For the reasons set forth here, the Commissioner's motion is granted and Ms. Douglas's motion is denied.

## PROCEDURAL HISTORY

Ms. Douglas applied for DIB and SSI in September 2002, claiming that she became disabled on October 15, 2000 due to major depression and arthritis in her knees and shoulders. (R. 153-55, 185, 715-17.) The applications were denied initially in December 2002, and again on reconsideration on March 28, 2003. (R. 55-59, 62-65, 719-23, 725-28.) In April 2003, Ms. Douglas submitted some additional medical evidence to the Bureau of Disability Determination Services ("DDS") and requested an administrative hearing. (R. 66.) Shortly thereafter on July 31, 2003, the DDS sent Ms. Douglas a letter stating that there was a problem with the doctor they had assigned to examine her. Specifically, the DDS discovered that Claude Hamilton, M.D.'s medical license had

lapsed for a brief period of time, including the time of Ms. Douglas's examination. The DDS thus "offer[ed] to reopen and reevaluate [her] claim." (R. 67.) Ms. Douglas's case was in fact reopened on October 28, 2003, but her request for benefits was again denied on November 4, 2003.[1] (R. 53-54, 68-70, 729-30, 731-32.)

On January 23, 2004, Ms. Douglas requested an administrative hearing, and a few months later on September 21, 2004, she retained legal counsel. (R. 71-72, 87-88.) Administrative Law Judge Helen Cropper (the "ALJ") initially scheduled a hearing for August 25, 2005, but she continued it to October 2005, and then again to November 29, 2005 so Ms. Douglas could obtain additional medical evidence. (R. 25, 73-86, 89-116.) Shortly after the November 29 hearing, on January 27, 2006, the ALJ denied Ms. Douglas's claim for benefits, finding that she has the residual functional capacity ("RFC") to perform her current light work as a home health aide. (R. 25-50.) The ALJ found that Ms. Douglas's history of substance dependence, depression, obesity and degenerative joint disease are severe impairments, and acknowledged that when Ms. Douglas was using cocaine and alcohol, she lacked the mental capacity to sustain even unskilled work. The ALJ noted, however, that Ms. Douglas has been sober since August 2003, and that she "has had the mental RFC to perform her current occupation . . . since she achieved sobriety." (R. 49.)

On March 28, 2006, Ms. Douglas submitted a Request for Review, and asked for copies of exhibits and the hearing tape, as well as additional time to submit further evidence and argument in the case. (R. 19-21. The Appeals Council sent Ms. Douglas the material she requested, but ultimately denied her appeal on June 15, 2007. Ms. Douglas now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (R. 10-12, 17-18.)

---

[1] The documents reopening Ms. Douglas's case both refer to an unfavorable decision dated March 20, 2003. (R. 53, 29.) To the extent the decision was actually dated March 28, 2003, the court views the discrepancy as a typographical error.

## **FACTUAL BACKGROUND**

Ms. Douglas was born on February 6, 1963 and was nearly 43 years old at the time of the hearing before the ALJ. (R. 140.) She has a high school education and completed one year of college. (R. 750.) She has never been married and has two sons. (R. 747-49.)

Prior to August 2000, Ms. Douglas lived with her mother and her stepfather of 15 years. She held a series of part-time and full-time jobs, including working in a tax office during tax season and re-stocking shelves for a department store. (R. 754-55.) In or about March 2000, she took a four or five month leave of absence from a job at Wal-Mart in order to care for her mother, who died of cancer on August 9, 2000. Ms. Douglas also cared for her stepfather, who died on October 2, 2000 from injuries he sustained after being hit by a car. (R. 405, 406, 161, 755.) In late 2001 or early 2002, Ms. Douglas lost her mother's home due to nonpayment of property taxes, and she then lived for a time with a boyfriend and a friend before moving out on the streets. (R. 748-49.) In February 2002, the Department of Children and Family Services took her sons away from her because the younger boy (now 6) tested positive for drugs. (R. 747-49, 768-69.)

### A.   Medical History

Ms. Douglas produced medical evidence confirming that she has been diagnosed with, and treated for diabetes, obesity, high blood pressure, high cholesterol, joint pain and substance dependence. She claims that she began receiving treatment for depression in 2000, but the medical records reflect that she first presented to Cook County Hospital (hereinafter, "Stroger Hospital") with symptoms of depression on July 23, 2002. Achutha B. Shenoy, M.D., a psychiatrist at the Fantus Health Center, diagnosed "clinical depression secondary to drug abuse (cocaine and alcohol)." (R. 439, 765.) Dr. Shenoy initially treated Ms. Douglas once per month, but later saw her every three months. (R. 788-89.) On or about August 30, 2003, Ms. Douglas told Dr. Shenoy that she had stopped using alcohol and drugs as of July 1, 2003. She reported feeling "stable" and was in a "pretty good" mood. At the time, she was taking Naprosyn, Depakote, Effexor, Trazodone

and Risperdal to control her pain, substance dependency, and symptoms of depression and insomnia. (R. 701.)

On September 2, 2003, James A. Runke, M.D. completed an Internal Medicine Consultative Examination of Ms. Douglas for the DDS. (R. 314-18A.) Ms. Douglas's chief complaint was arthritis in her knees, shoulders and back. She told Dr. Runke that she could only walk "maybe a block" and could not climb stairs or bend over due to back and knee pain. (R. 314-15.) Dr. Runke observed "limited range of motion at the lumbar spine and both knees with pain." Ms. Douglas had normal grip strength and manual dexterity, however, and she denied having any trouble sitting or standing. (R. 315-16.) Dr. Runke found Ms. Douglas to be "appropriate, polite, pleasant and cooperative, and able to relate clear, concise coherent medical history without apparent cognitive difficulties." (R. 316.) He diagnosed diffuse joint pain, obesity and a history of psychiatric impairment, though he noted that Ms. Douglas "exhibited no signs of agitation, irritability, anxiety, depressed affect or other cognitive or emotional abnormalities at the time of this evaluation." (R. 316-17.)

In February 2004, Ms. Douglas told Dr. Shenoy that her mood was "OK." (R. 702.) A couple of months later on April 30, 2004, Ms. Douglas reported feeling more depressed and told Dr. Shenoy that she had considered suicide several weeks prior to the visit. Dr. Shenoy adjusted her medication and encouraged her to seek counseling. (R. 703.) By August 2004, Ms. Douglas had "maintained a substance free lifestyle for 11 months and [was] employed as a homemaker." (R. 439.) Dr. Shenoy reported that she was pursuing regular follow-up care to receive her antidepressant and antipsychotic medications. (*Id.*)

Ms. Douglas saw Dr. Shenoy again on October 8, 2004, and reported that her depression was "stable." She denied having any feelings of guilt, hopelessness or insomnia, and stated that she was sleeping well. She also reported that she was taking her medications and found them helpful. (R. 706.) On December 30, 2004, Dr. Shenoy again described Ms. Douglas as "stable"

4

and simply refilled her prescriptions. (R. 707.) In March and June 2005, Ms. Douglas complained of "bad dreams," possibly because she was out of medication. She remained stable, however, and Dr. Shenoy refilled her prescriptions on both occasions. (R. 708-09.) On November 14, 2005, Ms. Douglas returned to Dr. Shenoy for another prescription refill. (R. 711.) The same day, Dr. Shenoy completed a Psychological/Psychiatric Impairment Report on Ms. Douglas. (R. 620-30.) He diagnosed cocaine-induced mood disorder in remission; bipolar disorder; and cocaine-induced psychosis in remission. (R. 620.) He opined that her mood shifts "may interfere with [her] ability to function socially," and that she "is not able to hold any gainful employment." (R. 624, 626.) On December 18, 2005, Ms. Douglas told Dr. Shenoy that her medications were "working well for her," that she felt "normal now," and that she was happy with her current treatment. (R. 712.)

### B. Ms. Douglas's Testimony

Ms. Douglas testified that she successfully completed several in-patient programs to treat her substance abuse, and that she has not used cocaine or alcohol since August 28, 2003. (R. 770-72.) In or about September 2003, Ms. Douglas began living at the Women and Children's Village, a residential substance abuse treatment facility for homeless women and children. (R. 746.) She shares a room with another female resident and has regular visitations with her two sons. At the time of the November 29, 2005 hearing, Ms. Douglas was petitioning the Juvenile Court to have her children returned to her custody. (R. 747.)

On November 12, 2003, Ms. Douglas started working as a Home Health Aide for an organization called "Help At Home." (R. 749.) Though the hours varied depending on availability, Ms. Douglas testified that she worked on average between 35 and 40 hours per week, performing jobs such as cleaning the patient's house; caring for the patient's personal needs; and cooking meals. At the time of the November 29, 2005 hearing, she was working a total of 26 hours per week for two clients, and earning $7.25 per hour. (R. 751-52.) Ms. Douglas stated that she gets along well with her clients and has no problem with attendance. She does have some difficulty

5

sweeping and mopping because of her back, and "a couple" of clients complained that she did not mop correctly. Help At Home responded by assigning her to different clients. (R. 752-53.) Ms. Douglas stated that she has been employed by Help At Home consistently since November 2003. (R. 773.)

With respect to her health, Ms. Douglas testified that she was diagnosed with diabetes in June 2003, and that she takes oral medication and insulin for the condition. She has received diet and exercise instruction from Stroger Hospital's diabetes program, but her blood sugar levels remain uncontrolled. (R. 759-60.) Specifically, she experiences fainting spells on occasion and has gone to the hospital "a couple of times" for treatment. (R. 760, 764.) Ms. Douglas weighed 273 pounds at the hearing, and acknowledged that her weight is "up and down." She tries to do some walking but her lower back, legs and knees give her "real bad problems." (R. 762.)

Ms. Douglas has been diagnosed with hypertension, and she uses eyedrops to treat glaucoma, as well as additional medication to treat high cholesterol. (R. 763-64.) She insists that she started receiving treatment for depression in 2000 after her parents died, but acknowledges that the medical records begin in 2003. (R. 765.) In May or June 2003, a psychiatrist at Stroger Hospital wanted to admit Ms. Douglas for treatment, but she declined to stay because it was Mother's Day weekend. (R. 766, 795.) She testified that she has not had any thoughts of suicide since that time. (R. 796.) Ms. Douglas's primary psychiatrist, Dr. Shenoy, has prescribed a variety of medications for her, including Effexor, Risperdal, Depakote, Zoloft, Geodon and Zyprexa. (R. 767-68.) She testified that though she can concentrate and function better when she is sober, her depression is "about the same." (R. 773.)

As for activities, Ms. Douglas stated that she stays with her boyfriend on the weekends, and they spend their time talking, watching television, doing household chores or shopping for groceries. (R. 779.) She also spends time with an aunt, a cousin and her children, and she is able to cook and lift about five pounds. (*Id.*)

6

### C. VE's Testimony

Grace Gianforte testified at the hearing as a vocational expert ("VE"). She stated that Ms. Douglas has past relevant work as a home health aide and stock clerk, which are both considered light and semi-skilled; a receptionist, which is sedentary and semi-skilled; a bagger, which is medium and unskilled; and a mail sorter, which is sedentary and unskilled. (R. 805.) The ALJ described a hypothetical person with Ms. Douglas's education, past work history, and age, who has the residual functional capacity to perform a full range of light work, with no climbing on ladders, ropes or scaffolds; no working on moving or unstable surfaces; no working at unprotected heights or on hazardous equipment; and occasional stair climbing, kneeling, stooping, crouching and crawling. The VE testified that such an individual could perform Ms. Douglas's past work as a home health aide, stock clerk and mail sorter. (R. 806-07.) If the same individual was limited to sedentary work, then she could still perform work as a mail sorter and receptionist. (R. 807.) This individual could also perform a variety of jobs available in the regional economy, including clerical checker and sorter (20,000 jobs), and order taker (25,000 jobs). (*Id.*) If the individual was limited to unskilled sedentary work, then there were still 25,000 order taker jobs she could perform. (R. 808.)

### D. The ALJ's Decision

In a lengthy and detailed decision, the ALJ found that Ms. Douglas suffers from a history of substance dependence, depression, obesity and degenerative joint disease, but that none of these impairments, either alone or in combination, meets or equals a listed impairment. (R. 25-50.) The ALJ determined that Ms. Douglas's allegations regarding her limitations were "not fully consistent with nor well-supported by the objective medical and other evidence," and concluded that since achieving sobriety in August 2003, she has maintained the physical and mental ability to perform her current occupation as a home health aide. (R. 49.)

**DISCUSSION**

**A.	Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Ms. Douglas is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

**B.    Five-Step Inquiry**

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act.[2] *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008); *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.    Analysis**

    **1.    Extension of Time**

Ms. Douglas's primary argument in support of her request for a reversal or remand is that the Appeals Council erred in denying her requests for more time in which to submit additional medical records. Specifically, Ms. Douglas suggests that she was unable to secure copies of her medical records from Stroger Hospital because the hospital was experiencing budgetary problems relating to improperly diverted property tax revenues. (Pl. Mem., at 4 n.8, 12-13.) As Ms. Douglas sees it, the Cook County budget "was being severely negatively impacted by massive diversion" of real estate property tax revenues, which was "orchestrated" to "create the necessary amount of

---

[2]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

Public Funding to submit to the International Olympic Committee in support of Mayor Daley's 'Olympic 2016' Bid." (*Id.* at 13.) In Ms. Douglas's view, these issues "should not be allowed to negatively impact" her case because "that negative impact would be against equity and good conscience."[3] (*Id.* at 13.) The court has no knowledge regarding these assertions, and Ms. Douglas has not provided any evidence establishing a causal link between the alleged budgetary problems and her failure to obtain records from Stroger Hospital. In any event, the record clearly demonstrates that Ms. Douglas had ample opportunity to obtain records that both pre-dated and post-dated the hearing before the ALJ.

Back in 2005, the ALJ continued Ms. Douglas's administrative hearing on two occasions to allow her to obtain additional medical records. (R. 25, 73-86, 89-116.) At the conclusion of the November 29, 2005 hearing, moreover, the ALJ granted a request from Ms. Douglas's attorney for an additional 45 days to obtain records from Stroger Hospital. (R. 812-13.) The ALJ noted that Dr. Shenoy appeared to be "quite supportive" of Ms. Douglas and suggested that she contact him directly. She also stressed, however, that the case was "very old" and should be resolved as soon as possible. (*Id.*) Ms. Douglas submitted some additional records after the hearing, but nothing from Dr. Shenoy or any other psychiatric treater. (R. 26.) On January 27, 2006, the ALJ denied Ms. Douglas's request for benefits.

On March 28, 2006, Ms. Douglas requested Appeals Council review. She also asked for a copy of the exhibits and the hearing tape, and requested that she not be required to submit her brief and/or new evidence until 45 days after she received these materials. The Appeals Council sent the materials to Ms. Douglas on September 28, 2006 and gave her 25 days in which to submit

---

[3] The "equity and good conscience" standard applies where the SSA "mistakenly has made an overpayment of disability benefits" and seeks to recover that overpayment. *Wilkening v. Barnhart*, 139 Fed. Appx. 715, 719 (7th Cir. 2005). *See also* 20 C.F.R. § 404.509(a); *Bonner v. Chater*, 54 F.3d 779 (7th Cir. 1995). Ms. Douglas cites no authority, nor is the court aware of any support for her suggestion that this standard also applies to requests for extension of time.

a brief and/or new evidence. (R. 17-18.) Ms. Douglas requested two more 45-day extensions on October 23 and December 7, 2006, and she asked for yet another 45-day extension on January 29, 2007. (R. 13-16, 816.) On February 27, 2007, the Appeals Council gave Ms. Douglas 25 more days to submit her brief and/or any new evidence, and stated that she would not receive any further extensions without "very good reasons." (R. 822.) On March 27 and May 30, 2007, Ms. Douglas twice more requested 45-day extensions. (R. 828, 833.) Finally, on June 15, 2007, the Appeals Council denied the May 30, 2007 request for extension and denied her request for review of the ALJ's decision. (R. 10-12.)

Altogether, Ms. Douglas had more than a year and a half to obtain her medical records from Stroger Hospital. The ALJ has a duty to develop a full and fair record, but "[t]he claimant bears the burden of producing medical evidence that supports her claims of disability." *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008). *See also Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability.") Here, the ALJ postponed the hearing on two occasions and, at its conclusion, gave Ms. Douglas 45 more days to obtain additional medical records. (R. 25.) The Appeals Council then gave Ms. Douglas over a year to secure the records she wanted, including any that post-dated the November 29, 2005 hearing. On these facts, neither the ALJ nor the Appeals Council erred in denying further extensions. *See Schmidt v. Barnhart*, 395 F.3d 737, 743-44 (7th Cir. 2005) (no "extraordinary circumstances exist[ed] . . . such that the Appeals Council should have further extended the applicable deadlines" where the claimant failed to explain why he could not submit his additional evidence after receiving more than a year and a half to do so); *Diaz v. Shalala*, No. 93 C 4755, 1994 WL 118471, at *5 (N.D. Ill. Apr. 5, 1994) (Appeals Council has "discretion to extend a filing deadline.")

The court notes that with respect to the pre-hearing records at issue, Dr. Shenoy himself stated that he first saw Ms. Douglas on July 23, 2002, which directly contradicts Ms. Douglas's

11

assertion that she began seeing him shortly after her parents died in 2000.[4] (R. 439.) In any event, the ALJ reasonably concluded that Ms. Douglas was abusing alcohol and cocaine until August 2003. (R. 772.) Prior to that date, therefore, Ms. Douglas was not eligible to receive social security benefits, regardless of whether she could ultimately produce medical records showing that she was being treated for depression during that time. See 42 U.S.C. § 1382c(a)(3)(J) ("[A]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.") See also Rogers v. Barnhart, 446 F. Supp. 2d 828, 848 (N.D. Ill. 2006) ("[B]enefits may not be awarded for disabilities causally linked to drug usage.")

The court finds no error in the handling of Ms. Douglas's numerous requests for extension, and her request for reversal or remand on this basis is denied.

### 2. Additional Arguments

Ms. Douglas makes several additional arguments in very cursory fashion, all of which lack merit. The court addresses each in turn.

#### a. Treating Physicians and Medical Experts

Ms. Douglas first argues that the ALJ improperly "played doctor" in finding that her depression is not disabling, and erred in failing to seek the testimony of a medical expert. (Pl. Mem., at 14.) An ALJ "must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." Clifford, 227 F.3d at 870. See also Grieves v. Astrue, No. 07 C 4404, 2008 WL 2755069, at *23 (N.D. Ill. July 11, 2008) ("An ALJ is not qualified to play doctor and interpret medical evidence.") In addition, a treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory

---

[4] At the hearing, Ms. Douglas's attorney stated that she was "willing to accept [Dr. Shenoy's] dating," and indicated that "my guess is, no, there are no records out there" from 2000 to July 2002. (R. 812.)

diagnostic techniques" and "not inconsistent with other substantial evidence." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). A claimant is not disabled simply because his treating physician says so, however. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Id.* (*quoting Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)).

Here, the ALJ discussed in detail the opinions of Dr. Shenoy and several DDS medical consultants regarding Ms. Douglas's mental impairment. (R. 42-43.) The ALJ reasonably rejected Dr. Shenoy's conclusion that Ms. Douglas is unable to perform any work, noting that his progress notes throughout 2004 and 2005 indicate that Ms. Douglas "was not reporting marked functional limitations at her clinic visits during those years." (R. 43, 702-12.) In addition, Ms. Douglas admitted at the hearing that Dr. Shenoy was unaware of the extent and duration of her work at Help At Home. As the ALJ explained, "[i]t is hard to imagine that [Dr. Shenoy] would opine that [Ms. Douglas] is unable to perform any work when she has done so successfully for longer than two consecutive years." (R. 43, 744.) *See Knight v. Chater*, 55 F.3d 309, 313-14 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.")

As for the medical expert testimony, the court "cannot fathom why the ALJ would have had a duty to call a medical expert in this case." *Hazzard v. Barnhart*, No. 00 C 7067, 2002 WL 442251, at *12 n.5 (N.D. Ill. Mar. 20, 2002). Ms. Douglas offers no support for this argument, and the court is satisfied that the ALJ had ample medical record evidence to render a decision. (*See* R. 31-43.) *See also Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("Here, the evidence was adequate for the ALJ to find [the claimant] not disabled, and the ALJ acted within his discretion in deciding not to call a medical expert.")

### b. Ms. Douglas's Credibility

Ms. Douglas next implies that the ALJ erred in rejecting her testimony that her symptoms of depression are "about the same" even though she has been sober since August 2003. (Pl. Mem., at 14.) In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id.* (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529. The ALJ must provide specific reasons for the credibility finding, but hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ devoted several pages to reviewing Ms. Douglas's testimony, and gave "some credit" to her stated limitations and activities. (R. 43-45.) The ALJ noted, however, that "even giving full credit to [Ms. Douglas's] testimony, the record establishes that claimant secured a competitive job within a short period after achieving sobriety, in August, 2003." (R. 45.) The ALJ accepted that Ms. Douglas "may still have feelings of depression and anxiety," but reasonably discounted the limiting effects of these feelings based on the fact that Ms. Douglas "has more regularly been treated for her physical and emotional problems, has reported to her doctors that she is doing well, and she has responded favorably to prescription medications." (*Id.*) On these facts, the court cannot say that the ALJ's credibility determination was "patently wrong." *Schmidt*, 496 F.3d at 843.

### c. VE Testimony

14

Ms. Douglas also claims that the VE's testimony was not legally supportable. Specifically, she notes that the VE relied on resources and materials that were several years old, and failed to bring current occupational projections for 2008 to the hearing. (Pl. Mem., at 14.) As a preliminary matter, "a vocational expert is not a required or even essential part of a disability benefits hearing." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994) (quoting *Ehrhart v. Secretary of Health and Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). The ALJ reasonably concluded that Ms. Douglas was capable of performing her past relevant work as a home health aide, as she had done continuously for the previous two years. Thus, the ALJ was not required to consider the VE's testimony regarding other jobs available in the regional economy. *Townsend v. Barnhart*, 28 Fed. Appx. 531 (7th Cir. 2002) ("Because the ALJ decided that [the claimant] was not disabled at Step 4, he did not need to reach Step 5.") Any alleged error at Step 5 of the ALJ's analysis is therefore harmless. *See Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) ("[T]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); *Bacidore v. Barnhart*, No. 01 C 4874, 2002 WL 1906667, at *10 (N.D. Ill. Aug. 19, 2002) ("Harmless errors are those that do not affect an ALJ's determination that a claimant is not entitled to benefits.")

In addition, there is no evidence that the VE refused to provide the data she relied upon in reaching her conclusion, or that she would have charged Ms. Douglas for any such production. *Cf. McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004) ("The data and reasoning underlying a vocational expert's opinions are not 'available on demand' if the claimant must pay for them.") Notably, Ms. Douglas's attorney did not request copies of the materials, and she affirmatively represented that she was "familiar with" the publications the VE cited, including the U.S. Department of Labor, Bureau of Labor Statistics, *Occupational Outlook Handbook*. (R. 809-12.) The VE also testified that her conclusions were consistent with the Dictionary of Occupational Titles, as required by SSR 00-4p. *See Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) ("SSR 00-4p requires an ALJ who takes testimony from a vocational expert about the requirements

15

of a particular job to determine whether that testimony is consistent with the Dictionary of Occupational Titles.") As for the VE's reliance on data from 2005, rather than more recent projections from 2008, she reasonably explained that "the numbers are fairly consistent" and "might be higher in the new publication." (R. 810.) In sum, the court finds no reversible error in the VE's testimony.

### d. Listings

Ms. Douglas finally suggests, in the conclusion section of her memorandum, that the ALJ erred in finding that her impairments, either alone or in combination, do not equal a listed impairment. (Pl. Mem., at 14.) Ms. Douglas fails to indicate which listing she purportedly meets or equals and, in any event, the ALJ thoroughly discussed a number of listings relevant to Ms. Douglas's symptoms and impairments. For example, the ALJ considered listings relating to diabetes (9.08), musculoskeletal problems (1.02), substance dependence (12.09) and depression (12.04). The ALJ also considered the impact Ms. Douglas's obesity would have on her other impairments. (R. 29-30.) *See also Prochaska*, 454 F.3d at 736 (citing SSR 02-1p) ("[A]n ALJ should consider the effects of obesity together with the underlying impairments.") Ms. Douglas does not explain how the ALJ's analysis is in any way flawed or incomplete, and the court finds no error at step 3. *See Burton v. Massanari*, 17 Fed. Appx. 396, 401 (7th Cir. 2001) (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs.")

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment [Doc. 23] is granted and Plaintiff's Motion for Summary Judgment is denied. The Clerk is directed to enter judgment in favor of the defendant.

ENTER:

Dated: September 22, 2008

*[signature: Nan R. Nolan]*
_____
NAN R. NOLAN
United States Magistrate Judge